## Grubb *against* Guilford.

F., seised in fee of a tract of land, sold and conveyed a small part of it to B. in fee, and, by the same instrument, did grant an easement or right to B. "from time to time, and at all times hereafter, to dig, take and carry away all iron ore to be found within the bounds of," the residue of the tract not conveyed; "provided the said B. his heirs and assigns, pay to the said F., his heirs and assigns, the sum of 6 pence per ton, for every ton taken from the premises." Held, that such easement or right is not appurtenant to the part of the land conveyed, so that it would pass by a sheriff's sale of the latter.

What property passes to a purchaser at sheriff's sale, must be ascertained from the levy under the *fieri facias;* its quantity and character cannot be extended or diminished by any subsequent official act of sale or conveyance.

THIS was an action of trover for twelve tons of iron ore, brought by Simeon Guilford and Franklin Wright, against Edward B. Grubb and Charles M'Curdy, in the district court for the city and county of *Lancaster*, of September term 1832, No. 19; in which, on the 3d of December 1833, the jury upon the issue joined, returned the following special verdict.

And now, to wit, December 3d, 1833, came Thomas Morgan, &c., jurors, &c., who do say, that on the 31st day of December 1749, the proprietaries of Pennsylvania, by their patent, *in hæc verba*, granted to John Forree, in fee, four hundred and two acres and allowance of land, in Hempfield township, Lancaster county; that the said John Forree, being so thereof seised, died, having, on the 21st day of April 1753, made his last will and testament, *in hæc verba*, which was, on the 30th June 1753, duly proved and approved in the register's office, before the register for said county, and letters testamentary in due form of law issued to Henry Strickler, Christian Forree and Abraham Myer, the executors named therein, who, in pursuance of the powers given them by said will, did, on the 28th of October 1765, by indenture, *in hæc verba*, grant and convey to David Forree, the son and devisee of the said John Forree, in fee, three hundred and two acres,

part of the land included in the patent of the 31st December 1749 : and the said David Forree, and Magdalena his wife, by their indenture, *in hæc verba*, dated 2d November 1791, and recorded on the 26th October 1792, conveyed to Jacob Heistand, in fee, two hundred and fifty acres of the said tract of three hundred and two acres ; and the said Jacob Heistand, by his indenture, *in hæc verba*, dated 8th April 1816, conveyed to his son, Jacob Heistand, Jun., eleven acres, more or less, of the said two hundred and fifty acres ; and the said Jacob Heistand, Jun., being so thereof seised of the said eleven acres, more or less, did, on the 29th September 1830, by deed, duly executed and acknowledged, *in hæc verba*, and recorded on the 1st of October 1830, convey to Simeon Guilford and Franklin Wright, the privilege and right of entering upon and digging and taking away all the iron ore from the said tract of eleven acres; all which, in evidence shown to the jury, manifestly appears : and the said jurors further find, that the said Simeon Guilford and Franklin Wright, afterwards, to wit on the 1st day of September 1831, entered on the said tract of eleven acres, and there dug and raised, or caused to be dug and raised, and placed the same *at the mouth of the shafts* or pits whereout it was dug and raised, twelve tons of iron ore ; which said twelve tons of iron ore so dug and raised by Simeon and Franklin, the defendants, Edward B. Grubb and Charles M'Curdy, on the 1st day of January 1832, took and converted *to their own* use, by carrying the same away from the said eleven acres of land : and the jurors further find, that Jacob Heistand, Jun., under whom the plaintiffs claim, and Jacob Heistand, Sen. and David Forree, under whom Jacob Heistand, Jun., claims, have been in the legal and actual possession of the premises, the eleven acres, from which the said iron ore was dug and raised by the plaintiffs, and taken and carried away by the defendants, from the 28th of October 1765, till the institution of this suit.

And the jurors further find, that the said David Forree, being so as aforesaid seised of the said three hundred and two acres of land, did, on the 19th day of September 1768, by articles of agreement, *in hæc verba*, made with William Bennet, agree to sell and convey to the said William Bennet, iron master, *twenty acres, a part of the* said tract of three hundred and two acres, *where ore had been dug*, in which articles of agreement it is agreed by David Forree to give William Bennet, his heirs and assigns, the privilege to dig ore on his, the said David Forree's remaining part of the three hundred and two acre tract, for 6 pence for every ton, if he, William Bennet, shall have occasion : and the jurors find that the said David Forree, by his deed, dated 6th of March 1769, *in hæc verba*, (but never recorded) did grant and convey to the said William Bennet, in fee, twenty acres of land, part of the three hundred and two acre tract devised to him under the will of his father, in which deed the said David Forree covenanted as follows : " and the aforesaid David Forree, for himself, his heirs, executors and administrators, doth covenant, promise,

[Grubb v. Guilford.]

grant and agree to and with the said William Bennet, his heirs and assigns, that he, the said William Bennet, his heirs and assigns, shall and may, from time to time and at all times hereafter, dig, take and carry away all iron ore to be found within the bounds of the said David Forree's tract of land, containing two hundred and eighty-two acres—provided the said William Bennet, his heirs and assigns, pay to the said David Forree, his heirs and assigns, the sum of 6 pence, Pennsylvania currency, per ton, for every ton taken from the premises of two hundred and eighty two acres aforesaid :" and the jurors further find, that the said William Bennet, being so thereof seised, judgment was, by due course of law, obtained against him by James Smith, for a debt of 2000 pounds, in the court of common pleas of Lancaster county, of November term 1770, No. 175, upon which judgment such proceedings were had, *in hæc verba*, that Frederick Stone, the sheriff of Lancaster county, sold, and, on the 10th of August 1771, by his deed, *in hæc verba*, conveyed the said twenty acres of land, late the estate of said William Bennet, with the appurtenances, to George Eichelberger, who, being so thereof seised, did, by his deed, dated 14th December 1771, *in hæc verba*, convey the said twenty acres of land to James Smith, in fee, with its appurtenances, who, by his deed, dated 29th April 1788, *in hæc verba*, conveyed the same twenty acres of land, with its appurtenances, to Thomas Neill, who, by his deed of 1st September 1794, *in hæc verba*, conveyed the same premises to John Wilkes Kittera, Esq., who, by his deed, dated 13th May 1797, *in hæc verba*, conveyed one undivided moiety of the same premises to Samuel Jago, who, by his deed and the deed of his wife, dated 6th May 1799, *in hæc verba*, conveyed the said moiety of the said premises to Thomas Neill, and the said John W. Kittera and wife, by their deed, dated 6th May 1799, *in hæc verba*, (they joining in the deed of Samuel Jago and wife) conveyed to Thomas Neill, the other moiety of the said premises, and the said Thomas Neill being so thereof seised, by his deed, dated the 5th of May 1802, *in hæc verba*, conveyed the same twenty acres, with its appurtenances, to Henry B. Grubb, in fee, who, by his deed, dated 18th September 1804, *in hæc verba*, conveyed the same premises, with their appurtenances, to Jacob Strickler, in fee, excepting and reserving unto the said Henry B. Grubb, his heirs and assigns, all the ore on the premises, as by the deeds in evidence manifestly appears.

And the jurors further find, that the said Henry B. Grubb is dead, and the defendant, Edward B. Grubb, is one of his sons and heirs at law, and that Charles M'Curdy, the other defendant, is his agent, and acted under his authority in taking and removing and converting the twelve tons of ore, as before found.

And the jurors do further say, that they are ignorant, in point of law, upon which side they ought to find, upon the foregoing facts so found, the issue; or whether, under the facts in the present form of action, they should find in favour of the plaintiffs : that if upon the

[Grubb v. Guilford.]

whole matters the court shall be of opinion that the issue is proved for the plaintiffs, and they can recover in the present form of action, they find accordingly for the plaintiffs, and assess their damages at 12 dollars and the costs of suit; but if the court are of a contrary opinion, then *vice versa*, or for the defendants.

On the 20th day of October 1834, the court, after argument, ordered the verdict, finding for the plaintiffs and assessing their damages at 12 dollars and the costs of suit, to be recorded, and rendered therefrom judgment for the plaintiffs; and at the same time delivered the following opinion :

Hays, president.

The fact (as stated in the special verdict) on which the present action is founded, is the taking and conversion by the defendants of twelve tons of iron ore, by carrying the same away from the land therein described, where the said ore had been dug and raised by the plaintiffs.

After setting forth the title of each party to enter upon the premises, dig, and carry away the ore to be found there, the verdict concludes—"that if upon the whole matters the court shall be of opinion that the issue is proved for the plaintiffs, and they can recover in the present form of action, they [the jury] find accordingly for the plaintiffs, and assess their damages at 12 dollars and the costs of the suit; but if the court are of a contrary opinion, then *vice versa*, or for the defendants."

The special verdict, therefore, presents two questions :

1. Whether the action of trover will lie in this case?

2. Whether it can be maintained by the plaintiffs?

1. It is well settled, that title to land cannot be tried in the action of trover. This is a transitory action, and title to land, upon obvious grounds of policy, can only be decided in those actions which are local, or, in other words, confined to the county in which the land lies. But the matter in controversy is not the title to land; it is the right to the twelve tons of iron ore, dug and raised upon these eleven acres of land, part of the two hundred and eighty-two acres remaining to David Forree after he conveyed the twenty acres to William Bennet. It is not disputed that the title to these premises is in Jacob Heistand, Junior; and the verdict finds that he and Jacob Heistand, Senior, and David Forree under whom he claims, have been in the legal and actual possession thereof, from the 28th of October 1765, until the institution of the present suit. 3 *Serg. & Rawle* 509; 10 *Serg. & Rawle* 119.

This ore, thus dug and raised, was a chattel, and, as such, a legitimate subject of trover.

Actions of trover have often been brought and sustained; not only for taking and converting ores and other minerals to the use of the defendant, after they were extracted from the soil by the plaintiff; but for digging, taking and carrying them away, all at the same time, by the defendant, and converting them to his use. 3 *Serg. & Rawle*

[Grubb v. Guilford.]

509 ; Player *v.* Roberts, 1 *Jones* 243, cited by the chief justice, and commented upon in 3 *Serg. & Rawle.*

There is little or no difficulty, then, in the first question.

2. But the other question involves many considerations of great difficulty, which were argued by the counsel with more than their usual ability and learning. It is a satisfaction and relief to me, to know that any opinion of mine will only open the door to the supreme court ; though, I will add, I have examined the subject with as much care as if I felt all the responsibility of an ultimate decision.

In trover, the plaintiff must have had, at the time of the cause of action accrued, either the actual possession, or the right to the immediate possession of the goods or chattels which are the subject of the action. He must also have a property in the chattel, either general or special; and the rule is, that the constructive possession of goods follows the property. 11 *Johns.* 259; 3 *Serg. & Rawle* 513.

If, then, the plaintiffs had the right or title to this ore—if it was their *property,* they shall be deemed to have had possession, when it was taken and carried away by the defendants, and converted to their use.

If, on the other hand, the right to this ore, or the property in it, belonged to the defendants, the present action cannot be maintained.

It results, therefore, in this question : Was this ore the property of Simeon Guilford and Franklin Wright, or was it the property of the defendants ?

In support of their claim, the plaintiffs have exhibited articles of agreement, dated the 27th of September 1830, between Jacob Heistand, Junior, and themselves, in which, for the consideration therein mentioned, the said Jacob Heistand granted and assigned to them " the sole and exclusive right and privilege to dig, take and carry away all the iron ore of every kind, wherever to be found, upon a certain tract of land belonging to the said Jacob Heistand, containing between ten and eleven acres, situate and lying in West Hempfield township, Lancaster county, adjoining lands of John Greider, Michael Bachman and others, with free ingress and egress to exercise and enjoy the said right and privilege; in consideration for which, they, the said S. Guilford and F. Wright, by the same articles bound themselves to pay, on the 1st day of April 1833, and annually thereafter, the sum of three hundred and fifty dollars; and also to pay one hundred dollars for each and every acre of land which should be destroyed for the use and enjoyment of the above conveyed privilege."

Jacob Heistand, Junior, purchased the premises from Jacob Heistand and wife, who conveyed the same to him by their deed of the 8th of April 1816.

These eleven acres, (or ten acres, forty-three perches) were part of a larger tract of two hundred and fifty acres, which were conveyed and assured to Jacob Heistand, Senior, by David Forree and

[Grubb v. Guilford.]

wife, by their deed of the 2d November 1791, being part of a still larger tract of two hundred and eighty-two acres, then held by the said David Forree under and by virtue of a devise in the last will and testament of his father John Forree, to whom the late proprietaries of Pennsylvania had granted a tract of four hundred and two acres and allowance, &c. (of which this was a part), by their patent dated the 21st December 1749.

There is no dispute with respect to this deduction of title ; but the defendants, in support of their defence, have set up what they contend is a higher and better title to the ore in these eleven acres than that exhibited by the plaintiffs.

On the 6th of May 1769, David Forree and wife, by their deed of that date, conveyed to William Bennet, an iron master, twenty acres in fee, being a part of the tract held by the said David Forree under and by virtue of the devise from his father John Forree, deceased, as before mentioned; which tract contained three hundred and two acres.   This deed, *inter alia,* recites that in consideration of 107 pounds, the said David Forree and his wife granted, bargained and sold, aliened, enfeoffed, released and confirmed unto William Bennet, his heirs and assigns, all the following described tract of land, part of the above described tract of three hundred and two acres, beginning, &c. (setting forth the metes and bounds), and containing twenty acres, and the allowance proportional to six acres per cent, &c., with all and singular, &c., to have and to hold the aforesaid tract of twenty acres of land and premises granted, mentioned or intended so to be, with the appurtenances, unto the aforesaid William Bennet, his heirs and assigns, &c.   And then follows a covenant in these words : "and the aforesaid David Forree, for himself, his heirs, executors and administrators, doth covenant, promise, grant and agree to and with the aforesaid William Bennet, his heirs and assigns, that he, the said William Bennet, his heirs and assigns, shall and may, from time to time and at all times hereafter, dig, take and carry away all iron ore to be found within the bounds of the said David Forree's tract of land, containing two hundred and eighty-two acres: provided he, the said William Bennet, his heirs or assigns, pay unto the said David Forree, his heirs or assigns, the sum of 6 pence, Pennsylvania currency, per ton, for every ton taken from the premises of two hundred and eighty-two acres, aforesaid."

Against William Bennet (the grantee in this deed), James Smith, Esq., obtained a judgment to the November term 1770, for 2000 pounds.   A *fieri facias* was issued to February term 1771, to which the sheriff returned "lands and goods levied."   On this a *venditioni exponas* issued to May term 1771, to which the return was "no buyers ;" and then an *alias venditioni exponas* to August term 1771, No 26, with a general return of "land and goods sold, insufficient," indorsed, together with a more particular return, in the following words:

"To the justices within named—

[Grubb v. Guilford.]

"By virtue of the within writ to me directed, I did, on the 28th day of June A.D. 1771, by way of public vendue, expose to sale the lands and tenements of the within defendant, by me taken in execution as within mentioned, and at the sale did sell a certain island situate in the river Susquehanna, nearly opposite the mouth of Codorus creek with its appurtenances, unto David Grier, for the sum of 160 pounds, lawful money of Pennsylvania, and did sell the ore bank by me taken in execution, containing about twenty acres, with its appurtenances, unto George Eichelberger for the sum of 60 pounds lawful money of Pennsylvania, those being the highest sums bid, and they the said David Grier and George Eichelberger, being the best and highest bidders at the said sales for the same premises.

"FREDERICK STONE, *Sheriff.*"

The *fieri facias*, by virtue of which the sheriff levied on these lands, has not been found; but in the recital of his deed to George Eichelberger for the ore bank taken in execution, and sold as stated in the above return, it is said, that to the said writ of *fieri facias* to him directed, he did return to the justices of the county court of common pleas, that, by virtue of the same writ, he had seized and taken into his hands in custody, as the estate of William Bennet, one island with the improvements, in the river Susquehanna, nearly opposite the mouth of the Codorus, and one ore bank, containing about twenty acres near Chiques's creek, in the township of Hempfield, in his bailiwick, the property of the said defendant, all which remained in his hands unsold for want of buyers, so that he could not have the moneys in the same writ, mentioned at the day and place therein contained, and that the residue of the execution of the said writ, appeared, by a certain schedule or inquisition thereunto annexed, by which said schedule or inquisition, taken before him, the said sheriff, on the oaths and affirmations respectively of twelve free, honest and lawful men, &c., it was found that the rents, issues and profits of the said island, with the improvements, and the said ore bank containing about twenty acres with their appurtenances, were not of a clear yearly value, &c.; and after proceeding with the recital of the *venditioni exponas,* advertisement, and sale to George Eichelberger, on the 28th of June 1771, the sheriff's deed contains the following grant: Now know ye, that I, the said sheriff, for and in consideration of the said sum of 60 pounds to me in hand paid by the said George Eichelberger, at or before ensealing and delivery thereof, the receipt and payment whereof is hereby acknowledged, have granted, bargained and sold, and delivered, and by force and virtue of the said recited writs, and by the laws and constitutions of this province of Pennsylvania do grant, bargain, sell and deliver unto the said George Eichelberger, his heirs and assigns, all that the said ore bank, containing twenty acres and the usual allowance, be the same more or less (it being the same ore bank which William Bennet purchased from a certain David Forree), together with all and singular the houses and outhouses, edifices and buildings,

thereon erected and being; and also, all and singular the *lights*, easements and appurtenances to the same ore bank belonging or in anywise appertaining, and the reversions and remainders thereof; and also, all the estate, right, title, interest, benefit, claim and demand whatsoever, of him, the said William Bennet, both at law and in equity, or otherwise, howsoever, of, in, to and out of the same premises and every part thereof, to have and to hold the said ore bank with its appurtenances, hereditaments and premises, hereby granted and released, or mentioned so to be, with their *rights*, members and appurtenances, unto the said George Eichelberger, his heirs and assigns, &c.

This deed was executed the 10th day of August 1771, and acknowledged the same day.

On the 14th day of December in the same year, George Eichelberger conveyed, by his deed of that date, these twenty acres, called the ore bank, to James Smith. This deed contains a very ample recital, setting forth the proprietaries' patent to John Forree; his devise to his son David Forree; the release of his executors to David Forree, pursuant to his will; David Forree's deed to William Bennet; the recovery by James Smith of his judgment against William Bennet; with the executions, levy, condemnation and sale of the ore bank by the sheriff to George Eichelberger.

James Smith and wife, by their deed of the 6th of May 1788, conveyed the same twenty acres of land and premises to Thomas Neill, who conveyed to J. W. Kittera in 1794, and *he*, one moiety thereof to Samuel Jago in 1795; and J. W. Kittera and wife and Samuel Jago and wife reconveyed, by their deed of the 6th of May 1799, the whole of the premises to Thomas Neill.

On the 5th of May 1802, Thomas Neill, by his deed of that date, conveys and assures the said tract of land and premises, situate in Hempfield township, Lancaster county aforesaid, containing twenty acres, and the usual allowance of six per cent, &c., together with all and singular the houses, outhouses, buildings, improvements, hereditaments, rights, members and appurtenances to the said island in the river Susquehanna, (also conveyed in and by this deed) and to the said tract of twenty acres of land situate in Hempfield township, county of Lancaster aforesaid, respectively belonging or in any wise appertaining, &c., &c., to have and to hold the said island in the river Susquehanna, and the said tract of twenty acres of land and premises in Hempfield township, county of Lancaster aforesaid, called the ore bank, hereby granted, with the appurtenances, unto Henry Bates Grubb, and to his heirs and assigns.

The defendants (Edward B. Grubb being a son and heir of Henry B. Grubb) claim, on behalf of the heirs and legal representatives of Henry B. Grubb deceased, title to and property in the ore in question, as a part of the iron ore found on the two hundred and eighty-two acres remaining in David Forree, after the sale and grant of the

twenty acres to William Bennet, by his deed of the 6th of March 1769.

It is contended for the defendants that Henry B. Grubb, deducing his title from William Bennet, had a right to all the iron ore to be found on those two hundred and eighty-two acres, of which the eleven acres mentioned and described in the articles between Jacob Heistand, Jun. and Guilford and Wright, were a part; that Forree's deed to William Bennet contained a grant to the latter, his heirs and assigns, of the privilege of digging, taking and carrying away all such ore, from time to time and at all times, with the single condition of paying 6 pence a ton to the grantor, his heirs or assigns; and that, by virtue of the judgment, executions, sales, sheriff's deed, deed of Thomas Neill to Henry B. Grubb, and the mesne conveyances, this privilege became vested in Henry B. Grubb, his heirs and assigns; that David Forree having conveyed away the right to all the iron ore in the said two hundred and eighty-two acres, Jacob Heistand, Jun., who, forty-seven years after, purchased eleven acres, part of those two hundred and eighty-two acres, had no authority to grant the same privilege to Guilford and Wright the plaintiffs, with respect to the ore in these eleven acres; and that the sale to them passed nothing.

That Henry B. Grubb's right, being a right to all the iron ore to be found on the premises, is necessarily exclusive, and that, consequently, as the plaintiffs, in digging and raising the twelve tons of ore mentioned in the verdict, acted in violation of such right, the defendants were justified in taking it away as the property of Henry B. Grubb's heirs.

To the array of title on the part of the defendants, many objections were urged, which are now to be considered.

1st. It was contended that whatever right or privilege William Bennet had under the deed of the 6th of March 1769, was not transmitted to Henry B. Grubb.

2d. That the clause containing the grant or privilege relied on, was, at best, in the nature of a secret conveyance, and that the plaintiffs, being *bona fide* purchasers without notice, are not affected by it.

1st. It was alleged, under the first head, that the right granted to William Bennet to dig, take and carry away all the ore on the two hundred and eighty-two acres of David Forree, was without consideration, and was therefore a mere license revocable at the will of the grantor before any thing was done or expended in prosecution of the privilege; that William Bennet, or any other person for him, or claiming under him, never incurred any expenditure, or did any thing towards the finding and raising of ore on those two hundred and eighty-two acres or any part thereof; that being a personal license merely, it could not pass to his assigns, or be transmitted to his heirs; that it was virtually revoked, and, if not, ceased at his death.

That more than sixty years having elapsed since the deed of 1769,

and previous to the purchase of Guilford and Wright, without any exercise of the privilege, it must be presumed that it was abandoned or released ; which presumption is sanctioned and confirmed by the acts of David Forree, in selling and conveying the greatest part of the two hundred and eighty-two acres without noticing in his deed the existence of the privilege.

That James Smith and the subsequent purchasers of the ore bank, as it was called, containing twenty acres, conveyed by David Forree in the deed of 1769, could only claim what was levied on and sold by the sheriff, as the property of William Bennet, to George Eichelberger ; that this right or privilege of William Bennet to dig and take the ore in the two hundred and eighty-two acres was neither levied on nor sold ; and therefore did not pass by the sheriff's deed of the 10th of August 1771 ; and that this breach in the defendants' claim of title, is fatal to their defence.

A license is an authority to do a particular act or series of acts upon another's land, without possessing any interest therein. It is founded in personal confidence and favour, and is not assignable. It may be by parol, or by deed in writing, and whilst executory it is always revocable at the 'pleasure' of him who gave it. Where A told B that he might pass and repass with his teams over the lands of A, who afterwards shut up the fence so that B could not pass, it was held to be a mere gratuitous license or promise, on which no action would lie. *3 Kent's Comm.* 452 ; 10 *Johns.* 246.

Modern cases, says chancellor Kent, distinguish between an *easement* and a *license*. A claim for an easement must be founded upon grant by deed or writing, or upon prescription, which supposes one ; for it is a permanent interest in another's land, with a right at all times to enter and enjoy it. A better reason for the distinction, I apprehend, is, that an easement must be upon some consideration, but a license may be without any. *3 Kent's Comm.* 452.

If the right or privilege granted to William Bennet, were without consideration, it would unquestionably have fallen under the denomination of a license, and been subject to the rules applicable thereto. But there are two answers to that assertion : 1. The compensation of the 6 pence a ton for every ton raised and taken away from the two hundred and eighty-two acres is a consideration, though not (formally and technically) so expressed. 2. The general consideration of 107 pounds applies to the grant of this right as well as to the twenty acres of land conveyed. All the benefits and advantages of a deed, as well those contained in whatever covenants may be inserted, as in the principal grant, shall be deemed to be in consideration of the sum expressed to be paid and technically called the consideration of the deed. Were this point involved in doubt, the rule that the deed shall be construed most strictly against the grantor, would avail in favour of the grantee.

I am of opinion, then, that this right was something more than a

[Grubb v. Guilford.]

license, the essential characteristic of which I take to be, that it is an authority given *without* consideration, to do any lawful act.

It was contended for the defendants, that their right was a common ; but such a designation is, I conceive, irreconcilable with the exclusiveness of their claim. It belongs, however, to the same description of rights or incorporeal hereditaments, which are divided into two classes: profits and easements. *Angell on Adv. Enjoym.* 19.

Profits are rights to the produce of the soil, either above or below the surface, as herbage, wood, coals, ore, or other minerals. Easements are defined to be a service or convenience, which one neighbour hath with another by charter or prescription, without profit ; as a way over his land, a sink or passage of water through it, and such like. The right of conducting water through one estate, for the use and convenience of an adjoining estate, is an incorporeal hereditament of the class of easements. The right of taking water out of another's well or pond, is a right of that class denominated profits. To this same class, belongs the right to dig and take the iron ore in David Forree's tract of two hundred and eighty-two acres.

The question next occurs, whether *nonuser* for sixty years, in connexion with the other facts, establishes a presumption of an abandonment or release of the right or privilege in controversy. There is a distinction between privileges founded on grant and those which are acquired by use. A right acquired by use, may be lost by *nonuser ;* and an absolute discontinuance of the use for twenty years, affords a presumption of the extinguishment of the right, in favour of some adverse right. But the mere *nonuser* of an easement or a profit, which is a right founded in grant, even for twenty years, will not necessarily raise a presumption of its extinguishment, unless there has been, in the meantime, some act done by the owner of the land charged therewith, inconsistent with or adverse to its existence, or some default or acquiescence in the claimant of the right ; in which case a release or extinguishment will be presumed. This distinction is illustrated by the chief justice, in the case of Nitzel *v.* Pascal, 3 *Rawle* 76. 3 *Kent's Comm.* 448 ; *Ibid.* 453, *note.*

In Butz *v.* Ihrie, the grantor had reserved a right to himself, his heirs and assigns, to raise, swell and dam the water of a stream, from a dam to be built on his own land. Thirty-two years elapsed from the time the right was reserved, to the time of building the dam ; and the question was, whether the reservation was barred, or forfeited, or lost by the lapse of time. The case was heard on an appeal from the circuit court held by the chief justice. And Judge Tod, delivering the judgment of the supreme court, says : " we are all of opinion that the lapse of time has not been such as to create any bar or forfeiture ; and that, under the circumstances of this case, the privilege reserved in the deed of 1793, was in full force in 1825, unaffected by any presumption. The omission to erect the dam can

scarcely, in this case, be called a *nonuser.* Certainly it cannot be called *laches.* It would have been otherwise, had the deed shown that an immediate exercise of the privilege reserved, was contemplated by the parties. Here the right of building the dam appears to be expressly reserved, even to the heirs and assigns of the grantors in the deed. " We concur in the opinion of the chief justice, expressed to the jury, that the law of limitations may be applicable to a case of this kind ; but that the time cannot begin to run against such a privilege by reservation, until some default, negligence, or acquiescence is shown, or may be fairly presumed in the owner." 1 *Rawle* 218.

Several points in this decision are observable. 1. The fact that the privilege was by reservation, appears to have been regarded as in some degree relieving it from the presumption which might otherwise have obtained. 2. Had the deed shown, that an immediate exercise of the right was contemplated, the time establishing, by its lapse, a presumption of extinguishment, would have begun from the date of the deed. 3. Notwithstanding this was a privilege reserved, and there was nothing in the deed to show it was the sense of the parties that it should be immediately exercised ; yet, if there had been any default, negligence or acquiescence on the part of the owner, the time would have begun from such default, negligence or acquiescence ; and a sufficient length of time, that is to say, twenty years *nonuser,* would have established a presumption of abandonment, or a release. 4. That this negligence, &c. might be shown, *i. e.* proved by direct evidence of the fact, or presumed, i. e. inferred from the proof of circumstances tending to that conclusion.

In Nitzel *v.* Pascal, 3 *Rawle* 76, the supreme court, in the opinion delivered by the chief justice, says, "it is certainly true, that a right of enjoyment may be lost in the same way it has been gained, and when acquired by an adverse possession for twenty years, it may be lost by *nonuser* for the same period. Where, however, it has been acquired by grant, it will not be lost by *nonuser,* in analogy to the statute of limitations, unless there were a denial of the title, or other act on the adverse part, to quicken the owner in the assertion of his right." The direct inference from the position here stated, is, that a right acquired by grant, might be lost by twenty years *nonuser,* if there were a denial of the title, or other act on the adverse part, to quicken the owner in his assertion of his right.

Applying the principles recognized in these cases to the facts of the special verdict, we will endeavour to ascertain whether the doctrine of *nonuser* affects the claim set up by the defendants.

Nothing has ever been done by the defendants—by Henry B. Grubb or those under whom they claim, in or towards the exercise of the privilege, or assertion of the right granted to William Bennet, to dig and take away all the iron ore in the two hundred and eighty-two acres of David Forree's land, until the removal of the twelve

[Grubb v. Guilford.]

tons of ore, for which this suit was brought, i. e. for a period of more than sixty years.

In 1791, more than forty years before that transaction, David Forree sold and conveyed two hundred and fifty acres of this land, without reservation or exception, to Jacob Heistand, in fee simple. The deed was recorded in 1792.

Although by this alienation David Forree parted with much the greater portion of the land in which the right to dig and take the iron ore had been granted to William Bennet and his assigns, and conveyed it to Jacob Heistand, without excepting such right or noticing it in any form; but, on the contrary, expressly including all the rights, liberties, privileges and advantages, and the issues and profits thereof: yet there was no complaint or assertion of the right, on the part of William Bennet, or any person or persons claiming to be his assigns.

The deed was recorded nearly forty years before the ore in question was taken by these defendants. William Bennet and his assigns, claiming these profits out of the land, must be deemed cognizant of the fact of this sale, and of the deed after it was thus placed on record; and yet they remained quiescent.

Twenty-five years after this purchase, Jacob Heistand sold the eleven acres in which the plaintiffs dug and raised the twelve tons of ore which are the subject of the present action, to Jacob Heistand, Jun. The deed was dated in April 1816, but was not recorded until the 26th of October 1832. The grantor and grantee were severally in the actual possession of these premises, yet no claim or assertion of right was ever presented to or urged against them.

I cannot say the deed from David Forree to Bennet shows that an immediate exercise of the right was in their contemplation. I think it does not. But, from the facts stated, it is fairly presumable that from the recording of Forree's deed to Heistand, there was negligence, nay, acquiescence, on the part of Bennet and his assigns; for the fact of Forree's sale of two hundred and fifty acres of this land, in which the sole profits of digging and taking away all the iron ore had been granted to Bennet, and of his conveying them to Heistand absolutely, with all their rights, privileges and profits, was as complete a denial of Bennet's title as could be devised, and as well calculated to quicken the owner in the assertion of his claim.

According to the principles recognized in the decisions to which I have adverted, I am of opinion, then, that there were thirty-nine years, i. e. from the time of the recording of the deed of David Forree and wife to Jacob Heistand, to the taking and carrying away of the twelve tons of iron ore, during which a *nonuser* has been established, sufficient, in point of evidence, to raise the presumption of a release of the right of William Bennet and his assigns. Another circumstance fortifying this presumption, is, that the sheriff who levied on the real and personal estate of William Bennet, upwards of sixty years ago, and sold the same without satisfying his creditors

owing to the insufficiency of the defendant's property, did not mention this right in his levy or in his sale.    James Smith was the judgment and execution creditor.    It was his province, as well as interest, to show all the defendant's property to the sheriff.    He became the purchaser of the twenty acres called the Ore Bank, from the sheriff's vendor ; yet the sheriff, in his levy and sale, did not specify this right to dig, take and carry away all the iron ore to be found on the remaining two hundred and eighty-two acres.

But that omission has a more direct relation to another point : namely, the allegation that the sheriff did not sell this right; and the sheriff's vendor not having purchased it, could not pass it to James Smith, &c.    That it is not specifically mentioned or described in the sheriff's levy, is undeniable : but it is contended by the defendants, that the levy and inquisition did nevertheless include it, under the general term of " appurtenances ; " that the sheriff's deed conveyed it by the clause in the grant, of all and singular the *l*ights, easements and appurtenances to the same ore bank belonging or in any wise appertaining, and by the *habendum* to have and to hold the said ore bank, with its appurtenances, hereditaments, and premises hereby granted and released, or mentioned so to be, with their rights, members and appurtenances, unto the said George Eichelberger, &c.; and that this construction is strengthened by the recital and grant in the deed from Eichelberger to Smith.

The only evidence extant, of the levy, is the recital in the sheriff's deed, by which it appears that the sheriff seized and took in execution, *inter alia*, one ore bank, containing about twenty acres, near Chiques's creek, in the township of Hempfield, in his bailiwick, the property of the said defendant.    Here there is neither mention of, nor reference to, appurtenances.    The levy was simply on the " ore bank containing twenty acres."

The inquisition, indeed, found that the rents, issues and profits of the said island, with the improvements, and the said ore bank containing about twenty acres, with their appurtenances, were not of a clear yearly value, &c.; and the grant was, in its concluding general . clause, of all and singular the *l*ights, easements and appurtenances to the same ore bank belonging or in any wise appertaining ; and the *habendum* was, to have and to hold the said ore bank, with its appurtenances, hereditaments and premises, with their rights, members and appurtenances, &c.

Now it was contended on the other side, and with great reason, as well as upon sound authority, that in case of variance between the levy and the subsequent proceedings, the levy must govern ; for all the power of the sheriff to dispose of real estate is founded upon his levy.    He can neither inquire by an inquest, nor extend or sell any thing else.    If appurtenances could, therefore, by a proper interpretation, include the right in question, the levy not having embraced them, they could not be the subject of the inquisition, nor of the sale or assurance to the purchaser.    All, in these proceedings, be-

[Grubb v. Guilford.]

yond the levy, was a nullity. The argument on this point, I think, is unanswerable, so far, at least, as regards those appurtenances which do not pass without being mentioned.

But it was moreover urged, that if the levy had been expressly on the ore bank and its appurtenances, and the sale by the sheriff and his deed had conformed to it, yet that the term appurtenances would not have carried this right to dig and take the ore in the two hundred and eighty-two acres, residue of the tract of three hundred and two acres. For, 1. It could not be legally appurtenant to the twenty acres sold and granted, because land, it was said, cannot be appurtenant to a messuage, or one messuage to another, or land to other land; that appurtenances signify something incident to another thing, as principal, as hamlets to a chief manor, common of pasture to a messuage, orchards and gardens to a house, &c. And the thing appurtenant must agree with the more worthy or principal thing in nature and quality; as a common of estovers, &c. to a house; a forest to a manor or castle.

2. Again, the grant in Forree's deed to Bennet, of the privilege to dig and take the iron ore in the two hundred and eighty-two acres, was by a collateral covenant, not relating to nor concerning the conveyance of the twenty acres, but was of a thing wholly distinct from, and independent of the main grant, or conveyance of the deed. It was not expressed as being intended to be appurtenant to the twenty acres conveyed by the said deed; nor can it by any reasonable construction be inferred, as the intention of the parties, that it should be so held or considered.

3. It is not pretended that William Bennet used or enjoyed this right as appurtenant to the twenty acres called the ore bank; and in his deed from D. Forree, the twenty acres were conveyed to him with the appurtenances, by all the usual terms, and in the parts of the deed, commonly and technically assigned to the complete assurance of land intended to be conveyed, before the right in question was mentioned in a distinct covenant.

4. Lastly, in a sheriff's deed the grant must be specific and clear; nothing will, for instance, pass by such deed under a general clause of all other the lands, &c. of the defendants. 13 *Johns.* 537.

Upon a consideration of this argument, I am of opinion that the right or privilege of digging and taking the iron ore in the two hundred and eighty-two acres, was not granted in that deed as appurtenant to the twenty acres; that it was not used as appurtenant to the twenty acres by William Bennet—for it was not used or exercised at all; that such right, though it might be appurtenant to a furnace, being agreeable to its nature and quality, as affording a proper and the principal material for the support of its operations, could not be considered as an appurtenance to an ore bank, any more than the right to cut timber in one forest can be appurtenant to a different forest; or the right to till one field can be appurtenant to another; a meadow to a pasture; or a pasture to a wood.

[Grubb v. Guilford.]

The right or privilege, then, not being in its nature legally appurtenant to the twenty acres sold and conveyed to Bennet, and not having been granted to him as appurtenant thereto, nor enjoyed or exercised by him as such, it was not, and could not be, at the time of the sheriff's levy or sale, one of the appurtenances of those twenty acres of land called the ore bank. Consequently, it did not pass by the grant in that deed of the twenty acres, with the appurtenances, and could not have passed without a specific description, or at least designation of the same.

It is indeed true, that by the grant of a messuage *cum terris pertinentiis*, land occupied continually with the house passes, though land is not properly appurtenant to a house ; yet it has been ruled, that by the grant of a house or land, *cum pertinentiis*, another house or land does not pass, unless it be found to be parcel. 4 *Com. Dig.* 314 ; *Grant E.* 9. ; *Plowd. C.* 170; 1 *Lev.* 131 ; Bidle *v.* Bond, 12 *Co.* 5.

In the case under consideration, the right was not exercised by William Bennet, or enjoyed with the twenty acres ; it could not be parcel thereof, for it was of a different nature, being an incorporeal hereditament, and a mere profit in other land.

So, not being appurtenant to the twenty acres, it could not pass as an incident to them, as it was once said a thing appendant or appurtenant might pass without saying *cum pertinentiis*. *Co. Litt.* 307, *a., Cont.*; *Cro. El.* 18.

It is hardly necessary to add, that if the right in question did not pass, by the sheriff's deed, to George Eichelberger, no description, or recital, or grant, in his deed to James Smith, however comprehensive and specific, would supply the deficiency. In perusing this deed, it is not easy to resist the conviction of an endeavour, in its preparation, to effect such a purpose. In the recital, the grant, in the deed to Bennet, of the twenty acres is so described as if the right to dig and take the iron ore, had been intended by that conveyance to be made appurtenant to the ore bank or twenty acres. Thus, after giving the metes and bounds, the recital pursues the description as follows : containing twenty acres, &c. together also with the free liberty of the said William Bennet, his heirs and assigns, to dig, take and carry away, &c. Whereas this liberty or right was the subject matter of a subsequent and distinct covenant in Bennet's deed, following the grant and *habendum et tenendum*, in which the twenty acres and the appurtenances were completely conveyed and assured (as it has been already mentioned) by all the apt and usual phrases. There is also in Smith's deed, in the recital therein of the sheriff's sale, a statement which is not supported by the facts recited in the sheriff's deed : namely, that the sheriff did expose to sale the ore bank, containing twenty acres of land with the appurtenances and privileges, and the same accordingly sold and struck off to George Eichelberger. Now it has been shown that the sheriff did not levy on the twenty acres and the appurtenances, and there is nothing in the

[Grubb v. Guilford.]

sheriff's deed to show that he exposed to sale, or struck off any thing by the name of privileges of the ore bank.

The recital in Smith's deed goes on to say, that the sheriff did sell and convey to George Eichelberger, the aforesaid ore bank containing twenty acres of land, and every part thereof, with the appurtenances, to George Eichelberger, his heirs and assigns, for ever, for the same estate as he the said William Bennet had of, in, or to the said ore bank, containing twenty acres, and every part thereof, with the appurtenances, at and immediately before the said judgment was had and recovered against him, as in and by the said deed poll, reference thereto being had, may more fully and at large appear. But it will be seen, by the sheriff's deed thus referred to, that there is nothing in it of this peculiar designation of the estate conveyed, as being the same estate as he the said William Bennet, &c.

The grant in Smith's deed from Eichelberger, contains this somewhat singular reference: grant, bargain and sell, release and confirm unto the said James Smith, his heirs and assigns, all that above (i. e. in the recital) described tract of twenty acres of land called the ore bank and premises, with the appurtenances, as the same is above (i. e. in the recital) set forth and described, bounded and limited as aforesaid, together with all and singular the improvements, ways, woods, waters, water-courses, rights and privileges, hereditaments and appurtenances whatsoever thereunto belonging, or in anywise appertaining, &c. to have and to hold the aforesaid twenty acres of land and premises, hereby granted, mentioned, or intended so to be, with the appurtenances and *privileges*, unto the aforesaid James Smith, &c. &c.

But notwithstanding this apparent effort to supply what was evidently deemed an insufficient conveyance by the sheriff, it is too plain to admit of a doubt, that Eichelberger could only sell what the sheriff had conveyed to him—certainly not an iota more.

2d. It was lastly objected to the title set up by the defendants, that the grant of the privilege in question was, at best, in the nature of a secret conveyance, and cannot affect the plaintiffs, who are *bona fide* purchasers without notice.

To this it was answered, that they had equitable if not actual notice, and therefore cannot shelter themselves under the pretext of a *bona fide* purchase. It is supposed that such notice was furnished, first, by the sale and conveyance of the twenty acres to William Bennet; and second, by the recording of the deeds to subsequent purchasers, of those twenty acres and the appurtenances.

1. There is no proof of actual notice—and even if the usual notoriety of a purchase may be considered as constructive notice to a subsequent purchaser, in consequence of the change of possession, and the acts of ownership which often accompany and succeed the transaction, (which I, by no means, admit) yet here, it is to be observed, it would not operate with respect to this right to dig and take the iron ore in the two hundred and eighty two acres, since no

[Grubb v. Guilford.]

change of possession did take place, or was contemplated, even by the enjoyment of the right; and the right, in point of fact, was not exercised at all.

2. With respect to the recording of the deeds: the deed from David Forree and wife to William Bennet, was not recorded; so that, of the very origin of the title, which is set up adversely to the plaintiff's and the Heistands, under whom they claim, they had not even the constructive notice which the recorder's office might have afforded.

So of the proceedings on Smith's judgment—the levy and sale, and the sheriff's deed; we have seen there was, in these, no specific mention of this right, and nothing from which notice of its existence could be inferred.

The deed from George Eichelberger to James Smith, containing a very particular recital, (upon which I have already remarked) was never recorded.

And it is remarkable, that the subsequent deeds of James Smith and wife to Thomas Neill, Thomas Neill to J. W. Kittera, and Thomas Neill to Henry B. Grubb, do not (though each has a recital of the previous title) contain one word specifically describing or even referring to the right in controversy.

These facts, considered in connexion with another, viz. that the conveyance in the deed from David Forree and wife to William Bennet, was never designed to pass the title or transfer the possession to any other or more land than twenty acres of the tract then owned by the grantors, containing three hundred and two acres, appear to me to lead to the conclusion, that there was nothing to establish a constructive notice to Jacob Heistand, Sen. or Jun., of the grant of the right to dig and take all the iron ore in the residue of the two hundred and eighty two acres; and since the title of Jacob Heistand Jun., to the legal estate, including the entire fee simple in the eleven acres, with the issues and profits thereof, is unimpeachable on this ground, the title of the plaintiffs, under their agreement with him, to the sole and exclusive right and privilege to dig, take and carry away all the iron ore, of every kind, wherever to be found, upon the said tract, belonging to Jacob Heistand, Jun., is equally unassailable.

Upon the whole, I am of opinion that the issue *is* proved for the plaintiffs, and that they *can* recover in the present form of action.

Therefore, let the verdict for the plaintiffs, assessing their damages at twelve dollars and the costs of suit, be recorded, and let there be judgment thereon.

Assignment of error.

Upon the facts found by the special verdict, the defendants were, by law, entitled to the judgment of the court; and there is error in its having been rendered in favour of the plaintiffs.

*Montgomery* and *Ellmaker*, for plaintiffs in error, contended, that Forree conveyed the right of mining in the residue of the original tract as an appurtenance to the twenty acres; and it passed, as such, to Grubb, under the sheriff's deed. They cited, 2 *Black. Comm.* 20, 34;

[Grubb v. Guilford.]

3 *Kent's Comm.* 452 ; 4 *Kent's Comm.* 490 ; *Co. Litt.* 121, *b* ; 6 *Com. Dig., Grant, E.* 9, 11 ; Hill *v.* West, 4 *Yeates* 142 ; Pickering *v.* Stapler, 5 *Serg. & Rawle* 107; Foot *v.* Colvin, 3 *Johns. Rep.* 222 ; Smith *v.* Johnston, 1 *Penns. Rep.* 471 ; Keller *v.* Nulz, 5 *Serg. & Rawle* 246 ; Cooper *v.* Smith, 9 *Serg. & Rawle* 33 ; 1 *Penns. Black.* 294; 3 *Kent's Comm.* 448 ; Butz *v.* Ihrie, 1 *Rawle* 218; Nitzell *v.* Paschell, 3 *Rawle* 76 ; 1 *Stark.* 305 ; 6 *Cranch* 137 ; M'Pherson *v.* Cunliff, 11 *Serg. & Rawle* 427 ; Schermerhour *v.* Van Volkenburg, 11 *Johns. Rep.* 529 ; 9 *Cowen* 52 ; 1 *Wend.* 466.

*Champneys* and *Norris,* for defendants in error, were stopped by the court.

The opinion of the Court was delivered by

Rogers, J.—This was an action of trover for twelve tons of iron ore. The ten acres and forty-three perches from which the ore was taken, were part of a larger tract of two hundred and fifty acres, which was conveyed to Jacob Heistand, Sen. by David Forree and wife, by their deed of the 2d of November 1791, being part of a still larger tract of two hundred and eighty-two acres, then held by David Forree under the last will and testament of his father John Forree, who held, under a patent dated the 21st of December 1749, from the proprietors.

Jacob Heistand, Sen., being so seised, on the 8th of April 1816, conveyed eleven acres of the above described property to Jacob Heistand, Jun., who, on the 27th of September 1830, entered into articles of agreement with Guilford and Wright, wherein, for the consideration therein expressed, the said Jacob Heistand granted and assigned to them the sole and exclusive right and privilege to dig, take and carry away all the iron ore, of every kind whatever, to be found upon a certain tract of land belonging to the said Jacob Heistand, containing between ten and eleven acres, &c., with ingress, egress, &c. By this agreement, so far as regards the right of using the land for the purposes therein stated, the plaintiffs have acquired all the interest of Jacob Heistand, with all the powers he might have had in relation to the same previous to the agreement. Now it is clear, that Jacob Heistand, as the owner of the fee simple, and his assignees, have the undoubted right to raise ore on the premises, without molestation or hindrance from any one ; and more especially from him who stands in the relation of a wrong doer or trespasser. The title to land cannot be tried in an action of trover. 3 *Serg. & Rawle* 509 ; 10 *Serg. & Rawle* 119. But it is said that ore when dug and raised is a chattel ; and that it is sufficient to defeat the plaintiffs' action, to show either that the title is in the defendants or in some third person. 11 *Johns. Rep.* 529 ; 9 *Cowen* 52; 1 *Wend.* 466. It is not disputed, as a general principle, that in an action of trover a defendant may show title in a third person. But in the case at bar this principle does not apply, because Jacob Heistand

iv.—2 f

[Grubb v. Guilford.]

was in the actual possession of the land until the 29th of September 1830, when he sold and conveyed to the plaintiff, for a valuable consideration, the right, as above described, to enter and take all the iron ore in the ten acres and forty-three perches.   The contract was executed by the parties; by the plaintiffs, in pursuance of the grant, entering on the land and expending their money and labour in digging and raising the ore.   The defendants, finding the ore dug and at the pit's mouth, entered, took and converted the same to their own use.   For this injury the action of trover is an appropriate remedy.   3 *Serg. & Rawle* 509; Brown *v.* Caldwell, 10 *Serg. & Rawle* 114. If, as is alleged, the subsequent grant to Guilford and Wright was a violation of the previous grant to William Bennet, the question may be tried in an action on the case; or, perhaps, William Bennet and those who claim under him, have acquired by the contract such an interest in the soil as may enable them to sustain an ejectment for the recovery of the possession.   Under, however, the circumstances of the case, William Bennet, never having been in possession and not having done any thing in pursuance of the contract, does not become the owner of the ore when raised, which is a necessary ingredient in the positions of the defendants' counsel, that title in him is sufficient to defeat the action, although the defendants are wrong doers or trespassers.

But the form of the action is of but little consequence, as we understand it to be the wish of the parties to have the right to the mine settled.   It is not the intention of the court to express any opinion on the rights of William Bennet or his heirs, as they are not parties to the special verdict; nor in the view we have taken of the cause is this necessary.   We give no opinion on the point of *nonuser*, so much pressed by the counsel for the plaintiff, but shall take it for granted that Bennet's right was not impaired by time, and that it was a subsisting interest up to the sheriff's sale, and continued so until the commencement of this suit and trial of the cause.   The case, so far as Grubb's heirs are concerned, was this: on the 6th of March 1769, David Forree and wife, by their deed of that date, conveyed to William Bennet, an iron master, twenty acres in fee, being part of the tract of land held by the said David Forree, by a devise from his father John Forree deceased, as before mentioned.   This deed, *inter alia*, recites, that in consideration of 107 pounds, the said David Forree and wife granted, bargained, sold, &c. to William Bennet, his heirs and assigns, all the following described tract of land, beginning, &c., containing twenty acres and the allowance, to have and to hold the aforesaid tract of twenty acres of land and premises granted, mentioned or intended so to be, with the appurtenances, unto the aforesaid William Bennet, his heirs and assigns, &c.   Then follows the covenant or grant now under consideration, and which is particularly set forth in the special verdict, and which contains the consideration for which the grant was made, viz. 6 pence a ton for every ton taken from the premises of two hundred and eighty-

[Grubb v. Guilford.]

two acres. This deed was made in pursuance of a previous article of agreement made between these parties.

James Smith, Esq. obtained judgment against William Bennet to the November term 1770, for 2000 pounds. Several executions were issued, and among others an *alias vendilioni exponas*, to the August term 1771, on which the sheriff returned that he had taken in execution and sold a certain island, &c. to David Grier, for 160 pounds, and also that he sold the ore bank taken in execution, containing twenty acres, with its appurtenances, to George Eichelberger, for the sum of 60 pounds, lawful money, &c.

The *fieri facias*, by virtue of which the sheriff made his levy, is lost. But in the recital of the sheriff's deed to Eichelberger, it is said, among other things in the return, that he seised in execution one ore bank containing about twenty acres, &c. But in the inquisition it was found, as appears by the same recital, that the rents, issues and profits of the island, &c. and the said ore bank, containing about twenty acres, with the appurtenances, were not of a clear yearly value, &c. In the deed, the sheriff grants, bargains, sells and delivers to George Eichelberger, his heirs and assigns, all that, the said ore bank, containing twenty acres, and the usual allowance, be the same more or less (it being the same ore bank which William Bennet purchased from a certain David Forree), together with all and singular the houses, outhouses, edifices and buildings thereon erected and being ; and also all and singular the lights, easements and appurtenances to the same ore bank belonging or in anywise appertaining, and the reversions and remainders thereof; and also all the estate, right, title, interest, benefit, claim and demand whatsoever, of him the said William Bennet, both at law and in equity or otherwise, howsoever, of, in, to and out of the same premises and every part thereof; to have and to hold the said ore bank, with its appurtenances, hereditaments and premises hereby granted and released, or mentioned so to be, with their rights, members and appurtenances, unto the said George Eichelberger, his heirs and assigns, &c. By several intermediate conveyances, the title of George Eichelberger, the sheriff's vendee, to the twenty acres and its appurtenances, became vested in Henry B. Grubb, and the defendants claim as his heirs and legal representatives. The defendants contend, that Henry B. Grubb, who derives title from William Bennet through the sheriff's vendee, has a right to all the iron ore to be found on the two hundred and eighty-two acres; that Forree's deed to William Bennet contains a grant to the latter, his heirs and assigns, of the privilege of digging, taking and carrying away all such iron ore, from time to time, and at all times, with the single condition of paying 6 pence a ton to the grantor, his heirs and assigns ; that by virtue of the judgment, executions, sale, sheriff's deed, and the several conveyances referred to in the special verdict, this privilege became vested in Henry B. Grubb, his heirs and assigns ; and that consequently, David Forree having conveyed away the right to all the iron ore in

the said two hundred and eighty-two acres, Jacob Heistand, Jun., who afterwards purchased the eleven acres, part of the two hundred and eighty-two acres, had no authority to grant the same privilege to Guilford and Wright.

It is unnecessary to examine the intermediate conveyances from Eichelberger to Grubb. Grubb has the same right that Eichelberger acquired at the sheriff's sale, and it is obvious, that whatever words may be used in these conveyances, they cannot enlarge the title vested in the sheriff's vendees. And this makes it requisite to ascertain the extent of this right. It is contended that the privilege of taking ore, as it existed under William Bennet, is passed to Eichelberger, by the sheriff, as an easement or appurtenance to the twenty acres. Before examining this question, I must remark, that in case of a variance between the levy and the subsequent proceedings, (which may have been the case here, although it does not distinctly appear) the levy must govern. Although the power of the sheriff to dispose of real estate is founded on the levy, he can neither inquire by inquest nor extend nor sell any thing else. But the court do not think proper to rest the cause on this point. I shall proceed to examine the question, whether the privilege or right in controversy is appendant or appurtenant to twenty acres; for if so, it must be admitted that the words in the sheriff's deed are sufficiently comprehensive to pass the interest. About the general principles of this branch of the law, there can be no difficulty. To make a thing appendant or appurtenant, it must agree in quality and nature to the thing whereunto it is appendant or appurtenant; as a thing corporeal cannot properly be appendant to a thing incorporeal, nor a thing incorporeal to a thing corporeal. But things incorporeal which lie in grant, as advowsons, commons and the like, may be appendant to things corporeal, as a manor, house or land; or things corporeal to things incorporeal, as lands to an office. But yet, as has been said, they must agree in nature and quality. *Co. Litt.* 121, *b.* And although lands cannot in general be appurtenant to land, yet the parties may, by express words of intention, or by their conduct, as using the one as parcel of the other, make the one appendant or appurtenant to the other.

Thus, although, by the grant of a messuage *cum terris pertinentiis,* land occupied continually with the house passes, though land is not properly appurtenant to a house; yet it has been ruled, that by the grant of land *cum pertinentiis,* another house or land does *not* pass, *unless it be found to be parcel.* 4 *Com. Dig., Grant,* 314; *Plowd.* 170; 1 *Lev.* 131; 12 *Co. Litt.* 5; 1 *Com. Dig.* 530, *tit. Appurtenances;* 3 *Saund. Rep.* 401, *note* 2; 1 *Rob. on Wills* 400; 3 *Bac. Abr., tit. Grant,* 397; 1 *Serg. & Rawle* 169; 5 *Serg. & Rawle* 107; 4 *Yeates* 146; 7 *Mass. Rep.* 6; 6 *Mass. Rep.* 332; 17 *Mass. Rep.* 443; 3 *Rawle* 271; 1 *Johns. Cha.* 284.

In the case at bar, the right was never exercised by William Bennet, nor was the privilege of raising ore ever enjoyed by him or any

[Grubb v. Guilford.]

other person, as an appurtenance to the twenty acres; it cannot therefore, on that ground, be considered as parcel thereof.

Nor can it pass as an incident to the twenty acres, as a thing appendant or appurtenant may sometimes pass, without saying *cum pertinentiis*; *Co. Litt.* 307; *5 Serg. & Rawle* 107; *3 Rawle* 271; for however convenient it might be to own both, yet the right to the one is by no means necessary to the enjoyment of the other. It is said that it was the object of William Bennet to obtain a monopoly of the iron ore, for the supply of a furnace of which he was the owner at the mouth of the Codorus creek. And if this be so, the object is attained by the ownership of both; and the argument would rather tend to show that the twenty acres and the right in question were appurtenances to the furnace. It is a practice by no means uncommon for the owners of iron works to purchase land in fee simple, and wood-leave on lands adjoining. Now it never has been thought that the privilege in the one case was appurtenant to the right to the other, and that a conveyance of the one, either with or without the word appurtenances, carried with it the right to the other; although the conveyance of the iron works, when it had been held as parcel, might, under particular circumstances, have that effect. But although these are the general rules, yet these rules, like all others, are subject to exceptions, arising from the clear, manifest intention of the parties; and this makes it necessary to examine the contract of the 19th of September 1768, and the deed of the 6th of March 1769, from David Forree to William Bennet. This is the foundation of the defendants' title; and unless it is made an appurtenance by these instruments, the defendants have no title. It appears that at the time this contract was made, William Bennet was the owner of a furnace at the mouth of the Codorus creek. His intention, therefore, was to obtain an adequate supply of iron ore for the use of his works; and this object he attains in the usual way, by the agreement or contract of the 19th of September 1768. The memorandum of the agreement, after particularly describing the twenty acres, the price agreed to be given for the same, proceeds to say: "and the said David Forree hath *further* agreed to and with the said William Bennet, to give him and his heirs privilege to dig ore on his other land, for the payment of 6 pence for every ton, if he hath occasion." In pursuance of this agreement, David Forree made a deed to William Bennet, of the 6th of March 1769. In this deed he conveys to him, for the consideration of 147 pounds, in fee, a title to twenty acres and its appurtenances; and then follow these words: "and the aforesaid David Forree, for himself, his heirs. executors and administrators, doth covenant, promise, grant and agree, to and with the said William Bennet, his heirs and assigns, that he the said William Bennet, his heirs and assigns, shall and may from time to time, and at all times hereafter, dig, take and carry away all iron ore to be found within the bounds of the said David Forree's tract of land, containing two hundred and eighty-two acres,

provided, the said William Bennet, his heirs and assigns, pay to the said David Forree, his heirs and assigns, the sum of 6 pence Pennsylvania currency per ton, for every ton taken from the premises of two hundred and eighty-two acres aforesaid."

The deed is a consummation of this contract, and it is, in some respects, more comprehensive than the article. It is a grant of twenty acres of land in fee simple, and also a grant of an incorporeal hereditament, for a distinct and different consideration, in the remaining part of the tract of two hundred and eighty-two acres. The right to raise ore is an incorporeal hereditament, granted for a valuable consideration, and is not, as has been contended, a license revocable at the will of the parties. The grantee, his heirs and assigns, have a right to enter, on a payment of the stipulated sum per ton, from time to time, and at all times hereafter. It is an easement, an incumbrance on the land; and, like a mortgage or judgment, the land passes into the hands of an alienee of the grantor, subject to the lien or incumbrance. There is a sufficient consideration for the contract, and I cannot agree with the plaintiffs' counsel, that an alienee of the grantor can be in any better situation than the grantor. It is part of his title. But although these positions are conceded to the defendants' counsel, yet I am at a loss to see any clear intention to make the one appurtenant to the other. It would be a strained presumption to infer this intention from the fact that they are included in the same deed, or from the warranty in the deed, which is only necessary, and which, properly construed, only embraces the conveyance in fee simple of the twenty acres; nor can this be gathered from the use of the word *appurtenances* in connexion with the twenty acres, which is but the usual formulary in the conveyance of real estate.

From a mature consideration of the article of agreement and the deed, we are clearly of the opinion that the right and privilege to take iron ore in the two hundred and eigty-two acres, was a distinct and independent covenant, having no relation to the conveyance of the twenty acres. It certainly is not expressly said to be appurtenant to the twenty acres. Although there might be, under particular circumstances, something in the argument that it was appurtenant to the furnace, there is no reason for holding that it is appurtenant to the twenty acres. This intention cannot, by any natural construction, be inferred.

Judgment affirmed.